AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

**FILED**
AUG 29 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Gold Motorola Model XT1765
IMEI: 355674083176654
(Target Device 1)

Case No. **19MJ3686**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the **Southern** District of **California**, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952 & 960 | Importation of controlled substances |

The application is based on these facts:
See Affidavit of Special Agent Deric Tanega, which is hereby incorporated by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Deric Tanega, DHS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/29/2019

*Judge's signature*

City and state: San Diego, California

Honorable Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Deric Tanega, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic devices:

> Gold Motorola Model XT1765
> IMEI: 355674083176654
> (**Target Device 1**); and
>
> Black Motorola Model XT1962-1
> IMEI: 355569091831007
> (**Target Device 2**) (collectively, the **Target Devices**)

as described in Attachments A-1 and A-2 (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960. This search supports an investigation of Maximino MORA GOMEZ (MORA GOMEZ) for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized from a vehicle driven by MORA GOMEZ on August 25, 2019 at the time of his arrest at the San Ysidro, California Port of Entry (POE), as he attempted to smuggle fentanyl and methamphetamine into the United States. The **Target Devices** are currently in the possession of the Department of Homeland Security and are presently stored at 9495 Customhouse Plaza, San Diego, CA 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe that there is probable cause to believe that a search of the **Target Devices** as described in Attachments A-1 and A-2 will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents.

1

The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

## EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). Currently, I am assigned to the multi-agency Operation Alliance in San Diego, California. I have been employed as a Special Agent since September 2018 and am presently assigned to a narcotics investigation group. My duties include, among others, investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. Prior to my tenure with HSI, I had been employed by the United States Border Patrol (USBP) as a federal law enforcement agent for approximately ten years.

6. My formal training includes the completion of the USBP Academy at the Federal Law Enforcement Training Center (FLETC) in Artesia, New Mexico. As a prior USBP Agent, I have participated in numerous arrests of individuals for human and drug-trafficking related offenses. I am familiar with methods utilized by drug-trafficking organizations and have been trained to identify trends, patterns, and behaviors employed by individuals attempting to smuggle illegal narcotics into the US. Additionally, I have completed the Criminal Investigator Training Program (CITP) and Homeland Security Investigations Special Agent Training (HSI-SAT) program in Glynco, Georgia, where I received extensive training in investigative techniques—including but not limited to physical surveillance, electronic surveillance, evidence gathering, and executing search warrants.

7. Since graduating from CITP and HSI-SAT, I have participated in and conducted investigations of violations of various state and federal criminal laws, including

unlawful possession with intent to distribute controlled substances, importation of controlled substances, and conspiracy to import, possess, and distribute controlled substances, all in violation of federal narcotics laws. These investigations were subsequent to arrests of individuals who imported, smuggled, received, and distributed controlled substances, including cocaine, heroin, methamphetamine, and fentanyl. Through these investigations, my experience and training with Border Patrol and HSI, as well as discussing the methods and practices of narcotics traffickers with numerous law enforcement officers, I have become familiar with the operations of drug trafficking organizations in the United States and Mexico.

8. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations, including the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

9. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. For example, based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

10. Based upon my Border Patrol and HSI training and experience, and consultations with law enforcement officers experienced in narcotics trafficking

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers and their accomplices often will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers often will use cellular/mobile telephones to communicate with drivers, including to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug traffickers often will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. The use of cellular telephones by drug traffickers and their accomplices tends to generate evidence that is stored on the cellular telephones, including but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my Border Patrol and HSI training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in

the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating the conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the target devices; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

12. Based upon my Border Patrol and HSI training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, emails, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

13. I also know from Border Patrol and HSI training and experience, and from

consultations with other law enforcement officers, that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

14. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

## FACTS SUPPORTING PROBABLE CAUSE

16. On August 25, 2019, at approximately 09:20 a.m., MORA GOMEZ applied for admission into the United States from Mexico at the San Ysidro, California Port of Entry as the registered owner, sole occupant, and driver of a 2006 Chevrolet Equinox bearing Mexican license plates MM/A27NVS5 (the vehicle). MORA GOMEZ presented his valid border crossing card and stated the vehicle was his. He further stated that he was going to Chula Vista to go shopping and that he had nothing to declare. In primary, a canine alerted to the undercarriage of the vehicle, and the vehicle was referred to the secondary inspection area.

17. In secondary, a Z-Portal scan revealed anomalies in the gas tank of the vehicle. A total of 33 packages weighing 25.36 kg (55.91 lbs.) were removed from the gas tank of the vehicle. The packages tested positive for fentanyl and methamphetamine.

6

18. The vehicle, drugs, and the **Target Devices** were seized.

19. Post-arrest, MORA GOMEZ was advised of his *Miranda* rights and invoked his right to counsel.

20. Mexican insurance documents for the vehicle, recovered incident to the arrest, indicate MORA GOMEZ insured the vehicle on April 9, 2019, with coverage becoming effective on April 12, 2019. A review of the border crossing histories for the vehicle bearing Mexican license plates MM/A27NVS5 and MORA GOMEZ shows MORA GOMEZ began crossing the border in a vehicle with those plates on April 14, 2019. Specifically, the records indicate MORA GOMEZ crossed the border in the vehicle 10 times between April 14, 2019 and his arrest on August 25, 2019.

21. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico into the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use, including gas tanks). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. When they arrive in the United States, smugglers often will take the drugs to a discreet location to transfer them to other people involved in the distribution chain who can then send the drugs to other locations for downstream distribution.

22. Given the facts surrounding MORA GOMEZ' arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activities of MORA GOMEZ will be found in the **Target Devices**. Such evidence could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data.

23. I also know that drug trafficking conspiracies require intricate planning

and coordination to successfully evade detection. Based upon my professional training and experience, this planning and coordination often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States, especially if the traffickers advise a courier to create a legitimate crossing history for a specific vehicle. Additionally, co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of valuable cargo, particularly in the hours following the arrest. Here, MORA GOMEZ purchased insurance for the vehicle on April 9, 2019 and began crossing almost immediately thereafter on April 14, 2019. Therefore, I believe that the appropriate date range for the search of the **Target Devices** is from April 9, 2019, up to and including August 25, 2019.

## METHODOLOGY

24. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not

all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

27. Based on all of the facts and circumstances described above, there is probable cause to conclude that MORA GOMEZ used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

28. Because the **Target Devices** were promptly seized during the investigation of MORA GOMEZ's trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by MORA GOMEZ and others continues to exist on the **Target Devices**.

//
//
//
//
//
//

9

29.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Deric Tanega
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this 29th day of August, 2019.

_____
The Honorable Andrew G. Schopler
United States Magistrate Judge

## ATTACHMENT A-1
PROPERTY TO BE SEARCHED

The following property is to be searched:

>Gold Motorola Model XT1765
>IMEI: 355674083176654
>(**Target Device 1**);

**Target Device 1** is currently in the possession of the Department of Homeland Security at 9495 Customhouse Plaza, San Diego, CA 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 9, 2019, up to and including August 25, 2019:

a. tending to indicate efforts to import methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952 and 960.**